REEVES (BLANCHARD v.). See Case No. 1,515.

---

## Case No. 11,659.

### REEVES et al. v. The CONSTITUTION.

[Gilp. 579.] [1]

District Court, E. D. Pennsylvania. Sept. 28, 1835.

BAILMENT — HIRER — USE — SHIPPING — DAMAGES FROM INJURY—COLLISION.

1. A hirer, having charge of the property of another, is answerable for an injury which is

---

[1] [Reported by Henry D. Gilpin, Esq.]

caused by the omission of that care which a man of common prudence would have taken in his own concerns.

[Cited in Adams v. Cost, 62 Ind. 270.]

2. An owner of property let out to hire, is not entitled to indemnity for an injury it may sustain in the service in which it is used, unless such injury is caused by an abuse of it, or by such negligence as brings responsibility upon the hirer.

3. Where a steamboat was hired for the purpose of towing a vessel, to which she was fastened, and both were under the direction of a licensed pilot, the owner of the steamboat is not entitled to damages on account of injury sustained in the course of the navigation, and not caused by undue negligence of the pilot.

[Cited in Boyer v. The Wisconsin and The Hector. Case No. 1,756; The Express, 46 Fed. 864.]

4. Where two vessels run foul of each other, without blame on the part of either, the loss must be borne by that on which it falls; if both are to blame it must be apportioned between them; if it is by the fault of one, that must make full compensation.

[Cited in The Rival, Case No. 11,867; The Moxey. Id. 9,894; The Bay State. Id. 1,-148; Foster v. The Miranda. Id. 4,977; Waring v. Clarke, 5 How. (46 U. S.) 503.]

On the 7th August, 1835, the steamboat William Wray, belonging to the libellants [Josiah Reeves and Isaiah Toy] was employed in towing the ship Constitution, to which she was fastened, up the river Delaware. There was a licensed pilot on board of the ship, under whose directions both vessels were steered. In the course of the passage, they came in contact with a schooner, sailing on the river, by reason of which the steamboat sustained considerable injury, and the libellants now claim compensation and indemnity for this damage.

Lex & Gerhard, for libellants.
Mr. Chester, for respondent.

The counsel for the respondent offered the deposition of the pilot in evidence, which was objected to by the counsel for the libellants, who cited 1 Starkie, Ev. 110; 3 Starkie, Ev. 1732; Morish v. Foote, 2 Moore, C. P. 508; Cuthbert v. Gostling, 3 Camp. 515.

Judge HOPKINSON directed the deposition to be read; observing, that if, on a further examination, the objection to it should be found to be good, it would be laid aside in the decision of the cause.

Mr. Lex, for libellants: This is a case of bailment. The owners of the ship are answerable for the want of skill or care in the pilot, although he is not chosen or appointed by them. Bussy v. Donaldson. 4 Dall. 206.

Mr. Chester, for respondent: The ship Constitution, at the time of the accident which occasioned the damage, was in the hands and under the government of a licensed pilot, in the river Delaware. There was no fault, negligence, or ignorance on his part by which the harm was done. If it were otherwise the owners of the ship are not answerable for it. The pilot is not their agent, but an officer of the port, into whose

custody and care they were bound to put the vessel. 1. The master and owners of a ship are not answerable for the default or want of skill of a pilot. He is not their agent, but a public officer. They are obliged to take him and give up the ship to him. 4 Smith's Laws, 73, 76, 77; The William, 6 C. Rob. Adm. 317. 2. The damage did not occur by any neglect of the pilot. The Woodrop Sims. 2 Dod. 83; Carruthers v. Sydebotham, 4 Maule & S. 77.

Mr. Gerhard, for libellants, in reply: The pilot is the agent of the owners for the purposes of this action. 4 Smith's Laws, 77; Fletcher v. Braddick, 2 Bos. & P. N. R. 182; The Neptune, 1 Dod. 467; The Eliza v. The Decatur, 1 Whart. Dig. 679; Snell v. Rich, 1 Johns. 305. This is a case of bailment. The steamboat was hired to the owners of the ship, and put wholly into their possession, and at their disposal. It is not the ordinary case of one vessel running foul of another. Story, Bailm. 264.

HOPKINSON, District Judge. The libel sets forth, that in August last the steamboat William Wray, owned by the libellants, engaged in trading between the port of Philadelphia and the port of Camden in New Jersey, and in towing vessels from foreign ports to the port of Philadelphia, was a tight and well built steamboat of the burden of ninety tons or thereabouts, and completely found and furnished. That she had on board the master, Frederick Roth, and three mariners, being a full complement to navigate her. That on or about the 7th day of August last, the said steamboat was employed by the master of the ship Constitution, for the purpose of towing her to the port of Philadelphia, from a place on the river Delaware called Fort Mifflin; the said ship having arrived from ports beyond seas. That the said steamboat was lashed along side of the said ship Constitution, on her starboard side; after which the steamboat was, by her master, delivered into the care, guidance, and management of the pilot, who was then on board of the ship, and who had the sole control of the said ship, from the time of his boarding thereof until the said ship should arrive at the port of Philadelphia. That the said steamboat being so delivered into the charge of the pilot, the said ship and steamboat were thereafter and at the time of the damage hereafter mentioned, and until the arrival of the said ship and steamboat at the port of Philadelphia, controlled and steered by the said pilot. That whilst they were proceeding to the said port, and whilst at or about a part of the said river opposite to the said port, a schooner, her name unknown to the libellants, was perceived nearing into shore, and athwart the path of the ship and steamboat, and thereupon the captain of the steamboat advised the pilot, so steering the ship and steamboat, to pass astern of the said schooner so nearing into shore. The libellants aver that if this had been done no damage would have happened; but the pilot, not heeding this advice, but either from malicious obstinacy or want of skill or power, refused or neglected so to do, and so steered and managed the ship and steamboat, that the steamboat was forced into contact with the said schooner. The damage done to the steamboat is then detailed, and a decree prayed for the damages of the libellants. The answer of Josiah Wilson, master of the ship Constitution, admits the employment of the steamboat for the purpose mentioned in the libel, the ship then being in the river Delaware, about four miles below the city, and being then under the sole management and control of one Richard Westley, a regularly licensed pilot, from the said place about four miles below the city, up to the said city. The respondent believes that the steamboat, under the command of one Frederick Roth, did proceed to the ship at the place aforesaid, and tow her up to the city. A bill, charging at the rate of five dollars per hour, during all the time the steamboat was employed, was presented to the respondent for the services then rendered by the steamboat, and was paid by him in full. The respondent was not on board of the ship or steamboat at the time the services aforesaid were performed. He does not know how the steamboat was furnished or manned. He is a stranger to all the other matters and things contained in the libel, but says that they are insufficient to entitle the libellants to the relief prayed for. Frederick Roth, the master of the steamboat, testified that he lashed the steamboat fast to the Constitution on the starboard side, about four miles below the city. He started the engine and gave way to the ship. As soon as the pilot had the ship in command, so that he could take charge of her, and had headway on her, the witness gave up the ship to him. He had charge of the ship and steamboat all the way up; the helm of the steamboat was pinned straight. The witness said to the pilot, that the ship was now in his charge, and that he gave her up, boat and all, to his command: that he could steer them where he pleased; and that if any accident happened it should be attached to the ship, to which they should look for damages. He proceeds: "We came along near to South street; the schooner was shooting into town; she had a small boat ahead towing her, with no sail set; we were about a square from her; I ran from the steamboat on to the ship, and told the pilot he had better go astern of her, or she would be foul of us. He halloed to the man at the helm to starboard, thinking that he could go ahead of her. Putting the helm starboard, shot the ship and steamboat into town. There was sufficient room to go astern." He then describes the damage done to the steamboat by coming in contact with the schooner; it was done by the flying jib-

boom of the schooner. He added, that if the pilot had said, stop the engine, it could have been done, but without his permission he could not do it. The ship, at the time of the accident, was within four or five feet of the wharf. These are the material facts testified on the part of the libellants. A replication was filed by them, admitting the payment of the sum mentioned for the hire of the boat, but denying that it was in satisfaction of the damages received by her. Edward Maule, a witness for the respondent, says that he was on board of the ship; that they got up near Almond street wharf; that some vessels were lying at anchor and some under way on the eastern side of the channel; there was a schooner ahead, with a boat towing her in to the wharf; the pilot of the ship halloed to the captain of the schooner, and told him to stop; he would not, or did not hear the pilot; the ship took the straight course up; she had to go inside of the schooner. The witness thought there was room enough to go inside of her without touching her, and that if the schooner had had her jib-boom rigged in, they would have done so; that they could not have gone astern of her without running into more vessels than they did; there was no chance at all of going astern of her. "When the schooner came in contact with us, we were very near the wharf, within six or seven feet; it was just high water, and the schooner had a boat ahead towing in to the wharf; it was the schooner's fault that she came in collision with the steamboat; if she had stopped one half minute, we should have gone clear of her." The witness was standing, with the pilot, on the round-house of the ship; he did not hear the captain of the steamboat give any advice to the pilot, there was so much noise that he could not hear it if he had; heard him say something, but did not attend to him. The witness was a passenger on board of the Constitution; he came to Philadelphia to get a branch to be a pilot; he has got it. Frederick Roth was called again, and said that "there were three sloops lying at anchor astern of the one coming in; there was fifty yards distance between the schooner and the nearest of the sloops at the time we struck."

On these facts several questions of law have been raised and argued, some of which it may not be necessary to decide. Before we examine how far the having a regular licensed pilot on board the ship, acquits her owners of all responsibility for an injury her navigation may have done to another, we must determine whether this is a case which entitles the injured party to redress from any body, or is one of the class, mentioned by Sir William Scott, which, happening without blame, must be borne by the party on whom it has fallen. This is not the case of two vessels running foul of each other, in which the question would be, whether it happened without blame in either,

and if so, then, as I have said, the loss must be borne by the party on whom it has fallen; or if both are to blame, then the loss is to be apportioned between them; or, if by the misconduct of the suffering party, he must bear it; if by the fault of the ship doing the injury, the injured party must have full compensation. The Woodrop Sims, 2 Dod. 83.

The counsel for the libellants have argued, and I think rightly, that it is a case of bailment, or hiring for a reward, and, of course, will be governed by the law of such a case. I shall so consider it; and if, on the established principles of such a case, the libellants are entitled to indemnity for the loss they have sustained, then the question will occur, whether the owner of the ship is relieved from this responsibility, because, at the time of the injury, his ship was under the management and control of a regularly licensed pilot of this port. Assuming that this is a case of bailment, in which the owner of the ship hired the steamboat for a stipulated reward, to be used for a certain purpose, what is the obligation of the hirer, in case of loss or injury to the thing hired happening, while employed in the service for which it was hired? The opinion of Lord Chief Justice Holt, in the case of Coggs v. Bernard, 2 Ld. Raym. 919, is well known to the profession, as containing a learned and generally exact treatise upon the whole law of bailment. It continues to be the leading case, the received text upon this important subject. In speaking of goods hired out, the chief justice says, "If goods are let out for a reward, the hirer is bound to the utmost diligence, such as the most diligent father of a family uses." In the treatise of Espinasse on the Law of Nisi Prius (2 Esp. N. P. 253), the law is thus given; "The hirer is to take all imaginable care, and if, notwithstanding, the thing be lost, he is not liable." In the beautiful, lucid and satisfactory essay on Bailments by Sir William Jones, he examines both of these opinions in his clear and discriminating manner, and shows that they are founded on an error, really confounding the case of a hirer, with that of a borrower, contrary to the obvious principles of justice, and destroying the distinction between them which Holt himself desired to establish. I quote from Sir William Jones, at page 120. "This contract," he says, "is advantageous to both parties, and the harmonious consent of nations will be interrupted, and one object of this essay defeated, if the laws of England shall be found, on a fair inquiry, to demand of a hirer a more than ordinary degree of diligence. In the most recent publication that I have read, on any legal subject, it is expressly said 'that a hirer is to take all imaginable care of the goods delivered to him.' The words 'all imaginable,' if the principle before established be just, are too strong in practice even in the case of a bor-

rower; but if we take them in the mildest sense, they must imply an extraordinary degree of care; and the doctrine, I presume, is founded on that of Lord Holt, in the case of Coggs v. Bernard, where that great judge lays it down, 'that if goods are let out for a reward, the hirer is bound to the utmost diligence, such as the most diligent father of a family uses.' It may seem bold to controvert so respectable an opinion, but, without insisting on the palpable injustice of making a borrower and a hirer answerable for the same degree of neglect, and without urging that the point was not then before the court, I will engage to show, by tracing the doctrine up to its real source, that the dictum of the chief justice was entirely grounded on a grammatical mistake in the translation of a single Latin word." After going through the proof of his criticism, he adds, "There is no authority, then, against the rule which requires of a hirer the same degree of diligence, that all prudent men, that is, the generality of mankind, use in keeping their own goods." In page 167, the rules are given, which are the result of the preceding principles and authorities maintained by this author. He says, "When the bailment is beneficial to both parties, the bailee must answer for ordinary neglect;" and at page 169, "The hirer of a thing is answerable for ordinary neglect;" and, going back to page 166 for the definition of ordinary neglect, we shall have the whole law of the subject before us; "Ordinary neglect is the omission of that care which every man of common prudence, and capable of governing a family, takes of his own concerns." To illustrate the meaning of this definition, we may add that which is given of slight neglect, which is said to be the "omission of that diligence which very circumspect and thoughtful persons use in securing their own goods." This is not required of a hirer, although it is of a borrower; and if this distinction is taken away, there will be none between them. The negligence of a borrower is construed rigorously, and, although slight, makes him liable.

This being the law of the case before us, we are to look to its facts, as they are given to us by the evidence, to decide whether the conduct of the pilot, who had the charge of the ship, when the injury complained of was done, was such as to subject him to the charge of ordinary neglect; of the omission of that care which a man of common prudence would have taken in his own concerns. In doing this, we must distinguish between the facts stated by the witnesses, and their opinions, more especially the opinions formed or declared after the misfortune happened, and which have, naturally, been more or less influenced by that event. The ship had come up from about four miles below the city, towed by the steamboat, with a flood tide which left her about the time of the accident. As she came near to Almond street or South street, being within a few feet of the wharf, not farther than five or six feet, she found a schooner, with no sails set, going in, towed by her boat. On the outside, some vessels were lying at anchor, and some under way, and the pilot of the ship was called upon at once to decide whether he would continue on in his course and endeavor to pass ahead of the schooner, that is, between her and the wharf, or go astern of her. He elected the former; and, in making the attempt, the jib boom of the schooner came in contact with the steamboat, and inflicted the injury for which compensation is now claimed.

Do these facts make out a case of such negligence as will entitle the libellants to the indemnity they seek? I should say, they do not; for, supposing the pilot acted with good faith, and with his best judgment, which is not questioned, and granting that he misjudged, and miscalculated his chance of getting clear of the schooner, yet it was a mistake which, in such a situation, where the chances were so nearly balanced, as we shall see, the most prudent man might have made in his own concerns. It discovers no such want of diligence as to be imputed as a fault in any man. He saw danger and difficulty on both sides; two evils to be avoided; he honestly, with his best judgment and skill, endeavored to avoid both, and betrayed neither carelessness nor ignorance in the attempt, although it was not successful. It is not uncommon for the best and wisest designs to miscarry.

We have, however, evidence in the case, on both sides, to give a more distinct character to this outline. This evidence consists, in part of facts, and in part of the opinions of the witnesses. For the libellants, Frederick Roth, the captain, as he is called, of this steam ferry boat, has testified, that when they were about a square from the schooner, he told the pilot he had better go astern of her; that "she would be foul of us;" that the pilot hallooed to the man at the helm to starboard, thinking he could go ahead of her; and that there was sufficient room astern. On the other hand, Edward Maule, who was a passenger on board the ship coming to Philadelphia, to get a pilot's branch, and did get it, testifies that he was standing, with the captain, on the round house of the ship, and did not hear the master of the steamboat give any advice to the pilot; that there was so much noise he could not hear it if he had; he heard him say something. This is the testimony intended to inculpate the pilot, because he neglected the advice that was given him. It is probable that he did not hear it; he made no answer to it. But if it be granted that he did hear it, was he bound to obey it against his own opinion? Might he not, nevertheless, exercise his own judgment without falling under the censure and penalties of malicious obstinacy, or culpable negligence, or want

of skill. The pilot thought, and so says Roth, that he could go ahead of the schooner, and if he did think so, he had a right to act upon that opinion, upon his own view of the emergency, unless it were so clearly erroneous and absurd, that a man of common prudence would not have so thought and acted. Roth thought that he had better go astern of the schooner, and that if he did not, she would be foul of them; and it was also his opinion that there was sufficient room for them astern. In these opinions he was not only opposed by the pilot, as manifested by his conduct, for I have not taken his deposition into the case, but also by the witness Maule, who, as far as we know, has neither an interest nor feeling in the event of this suit, and whose profession as a pilot, and position at the time of the accident, give to his opinion at least as much weight as is due to that of the master of a ferry steamboat, in a case in which we can hardly suppose he does not feel some bias, in his opinions not his facts, for his owners and his boat. Maule says that the pilot of the ship halloed to the captain of the schooner to stop; this was not indifference or inattention; but he would not, or he did not hear. He says that the ship took the straight course; that she had, or was obliged, to go inside of the schooner, and he thought there was room enough to do so without touching her, and there would have been if her jib boom had been rigged in. He thought that they could not have gone astern without running into more vessels than they did; that there was no chance of going astern of her. He says, that it was the schooner's fault that she came in collision with the steamboat; if she had stopped one half minute, we should have gone clear of her; and, I may say, the manner of the contact and injury proves this to be true. These are the opinions of Mr. Maule, and I cannot say that they are not entitled to as much weight, at least, as those of Mr. Roth. I may remark that if Roth, who says he did see the danger of going on, had stopped his engine, he would have saved his boat; but he chose to stand stiffly on his neutrality, although he could have incurred no responsibility by doing what he saw or thought the necessity of the emergency required. We see that points of etiquette are not confined to great affairs, but may do mischief between a pilot and the master of a ferry boat.

If we may not place this disaster in the chapter of accidents inculpating nobody, where shall we put the blame? On the pilot, the schooner, or the steamboat? The event has shown that either of them might possibly have prevented it. It is enough for our purpose to inquire whether it is imputable to the pilot, and was occasioned by his neglecting to do what every man of common prudence, capable of governing a family, would have done in the same circumstances. The libel charges him with a higher fault

than this, with a "malicious obstinacy" in not heeding the advice of Mr. Roth, and with want of skill and power in not passing astern of the schooner. But we have seen that, on the evidence, it is doubtful whether the advice of Roth would not have been followed by worse consequences than those which did happen, and, in such a case, I cannot agree that the pilot was guilty of obstinacy, or even erred in judgment in not submitting to it; nor do I see with what justice I can charge him with want of skill for a course of proceeding approved, nay thought indispensable, by a disinterested and competent judge of the case. He is opposed only by the master of the steamboat, confirmed, as far as he is so, by the accident that attended the course that was taken. The serious charge of obstinacy, ignorance and culpable negligence should not be heaped on a man whose living depends on his fidelity, skill and care, without clear and satisfactory evidence; much less should it be inferred, because the event was unfortunate, and most especially in a case in which the expectation and judgment of the accused party came within half a minute of being verified, and when it would have been verified if the captain of the schooner had heard and attended to the reasonable request of the pilot, a compliance with which he had a right to expect, without any impeachment of his prudence. If he had adopted the advice of Mr. Roth, and gone astern of the schooner, and, in doing so, had got foul of the vessels lying there, the charge of negligence or want of skill would have been sustained against him, by the opinion and evidence of Mr. Maule, at least as forcibly as it now is by the testimony of Mr. Roth. It was a case of very close calculation, in which an error might have happened to any man. If the ship and steamboat had been half a minute more in advance, they would have passed the schooner untouched; if half a minute later, the schooner would have passed them without injury. We should have a rule of negligence much more strict and severe than Lord Holt's, if we were to apply it to such a case. Even a borrower would hardly be liable in such a case, as may be inferred from the examples put by Sir William Jones, in which the articles loaned were undeniably exposed to greater danger than usage, or prudence, or the reasonable expectation of the lender would justify. The owner of a thing let out to hire must not suppose that he is to be indemnified for every injury it may sustain in the service it is put upon. The reward paid for it is presumed to include, not merely a compensation for the use of it to the hirer, but also for the ordinary wear of it, and the risk attending the employment, unless it be produced by an abuse of it, or by such negligence as brings responsibility upon the hirer. The owner of a ship, who lets her to hire, knows that she is to en-

counter the perils of the sea, injuries from tempests, and various accidents and losses that belong to the service in which he has hired her, and that must be borne by himself. So the man who hires to another a carriage or horse, knows that he exposes them to certain dangers; that the one may be broken and the other become lame, without any fault or abuse on the part of the hirer; and the owner is his own insurer for such losses. In fixing his compensation he is presumed to take them into consideration, and probably does so. A hired carriage may come into collision with another and be broken, without a culpable negligence in the driver; a horse may be ridden moderately and be judiciously taken care of, but he may fall lame or be foundered.

It is therefore my opinion, that the libellants are not entitled to any compensation or indemnity from the respondent, for the injury and damage done to their steamboat, complained of in their libel.

Decree: That the libel be dismissed with costs.